IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ZAK BORST,

        Plaintiff,

                                      2:16-CV-01328-PK

                                      OPINION AND
v.                                    ORDER


NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.
_____

PAPAK, Magistrate Judge:

      Plaintiff Zak Borst ("Borst") filed this action January 29, 2016, seeking judicial review of

the Commissioner of Social Security's final decision denying his application for disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of

Page 1 - OPINION AND ORDER

the Social Security Act (the "Act").[1]  This court has jurisdiction over Borst's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).  I have considered all of the parties' briefs and all of the evidence in the administrative record.  For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for the immediate payment of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2]  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the

---

[1]Borst originally filed a Request for Review of Hearing Decision/Order on June 8, 2014.  Tr. 268-69.  On July 10, 2015, the Appeals Council remanded the case back to an Administrative Law Judge for further proceedings.  Tr. 196-201.  After a second ALJ hearing and denial of benefits by the ALJ, the Appeals Council denied Borst's second for review.  Tr. 1-7, 14-41, 42-72.  This action followed.

[2]Effective March 27, 2017, updates were made to the regulations.  Some C.F.R. sections referenced in this opinion have been renumbered, but the citations listed here include the version of the C.F.R. that was in effect at the time Borst requested judicial review.

claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[3] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

---

[3] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's age, education, and work experience to determine whether a person with those

characteristics and RFC could perform any jobs that exist in significant numbers in the national

economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g),

404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner

meets her burden to demonstrate the existence in significant numbers in the national economy of

jobs capable of being performed by a person with the RFC assessed by the ALJ between the third

and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*,

482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566,

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits

if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see

also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing

Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id., quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible to more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[4]

Borst was born on January 3, 1982. Tr. 114, 127, 144, 339, 341, 413.[5] He graduated college, serves in the National Guard, and speaks English. Tr. 94, 106-07, 155, 165, 167, 170, 427, 429. According to the evidence of record, prior to his disability onset date of January 23, 2014, Borst worked as an attendant at a children's institution, volunteer information clerk, clinical counselor, body guard, artillery or naval gun fire observer, and sales clerk. Tr. 93-94, 105-06, 108.

The earliest medical evidence in the administrative record is from April 16, 2012, when Borst received treatment from Michael Drager, D.P.M., for discomfort in both of his feet. Tr. 602. Borst reported that his feet become more uncomfortable with increased activity, and had he

---

[4] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[5] Citations to "Tr." refer to the page(s) indicated in the official transcript of the Administrative Record filed herein as docket no. 9.

tried different shoes and insoles without success. *Id.* Upon examination, Dr. Drager found no swelling or discoloration, and noted that Borst's feet were warm to the touch, that his light touch and gross sensation were normal, and he had a "relatively stable gait with only mild pronation and not medical column collapse." *Id.* Dr. Drager diagnosed mechanical foot pain with intrinsic tendonitis, placed Borst in orthotics, and prescribed the use of Ibuprofen twice a day with icing and stretching. *Id.*

On May 14, 2012, Borst had a follow-up appointment with Dr. Drager where he reported wearing the orthotics "most all of the time," and only noticing pain when he runs. Tr. 603. Dr. Drager found Borst's "neurovascular status is grossly intact," and there was "no edema, erythema, or discoloration," and "no discomfort in the interspaces with palpation and compression," or discomfort around the tarsal tunnel area. *Id.* He scheduled a follow-up appointment for Borst for the next week to consider an injection for Borst's foot pain. *Id.*

On May 21, 2012, Borst returned for his one-week follow-up appointment with Dr. Drager where Dr. Drager noted mild foot discomfort in Borst's "area of the 3rd interspace near the metatarsal heads and into the adjacent aspects of the toes." Tr. 603. Dr. Drager injected Borst with Kenalog and Marcaine and in a separate note from that same day wrote that Borst "must run at own pace to tolerance until issues are resolved." Tr. 601, 734.

On June 4, 2012, Borst failed to show up for his scheduled appointment with Dr. Drager, but was seen on June 18, 2012. Tr. 603, 604. On June 18, Dr. Drager found "no real change" since his last appointment, but noted that Borst complained of "general weakness and muscle pain," explaining that sometimes he cannot get out of bed, move, and has a hard time lifting his arms above his shoulders. Tr. 604. Borst also reported having "some strange sensations in his

legs and feet," and that he "is very tired and can sleep 14 plus hours per day." *Id.* Upon examination, Dr. Drager found Borst's sensation was intact, there was no edema, erythema, or discoloration, and his muscle strength was normal and symmetrical. *Id.*

On July 16, 2012, Borst underwent a sleep study, and the following day results were interpreted by Dr. David Ramey. Tr. 554, 716. Borst was found to suffer from "profound daytime somnolence requiring multiple over-the-counter stimulant medications," and was diagnosed with "very mild obstructive sleep apnea." *Id.*

On December 1, 2012, an Officer Evaluation Report was completed on Borst's behalf. Tr. 566-70, 710-13. The report indicated that Borst was able to carry and fire his assigned weapon, evade direct and indirect fire, ride in a military vehicle for 12 hours in a day, wear a helmet and body armor for at least 12 hours in a day, wear load bearing equipment or military boots and uniform for 12 hours a day, and wear a protective mask for at least 2 continuous hours in a day. Tr. 569, 712. He was unable to move 40lbs while wearing protective gear, or live in an austere environment without worsening his medical condition. *Id.*

On January 14, 2013, Borst had a follow-up appointment with Dr. Ramey, where he noted that Borst had "a history of hypersomnolence with a relatively unremarkable diagnostic polysomnogram." Tr. 615, 623. Dr. Ramey noted that Borst was taking Adderall twice daily, which "has resulted in dramatic improvement of his daytime symptoms," and he "is not having any problems tolerating it." *Id.* Dr. Ramey also noted Borst's history of "diffuse shooting pains in both his arms and his legs" noting that Borst had an electromyography and nerve conduction studies done, which returned normal results. *Id.* Overall, Dr. Ramey found Borst was "doing well on Adderall," and planned to refer Borst to rheumatology for his diffuse pain complaints.

Tr. 616, 624.

On March 5, 2013, Borst presented at Kootenai Rheumatology and Internal Medicine to establish care and was seen by Dr. Andrea Dinning. Tr. 661. Borst was noted to have narcolepsy, chronic fatigue syndrome, and carpal tunnel and reported taking Adderall and Provigil for his narcolepsy and chronic fatigue syndrome, but reported Provigil caused stiffness in his back. *Id.* Borst was also noted to suffer from connective tissue disease, for which he received a steroid shot, which "helped a lot." *Id.* Dr .Dinning increased his Adderall dosage to treat his chronic fatigue syndrome. Tr. 663.

On October 24, 2013, Borst had a follow-up appointment with Dr. Dinning to clarify his previous diagnosis of connective tissue disorder. Tr. 656. Borst also complained of depression and anxiety, and expressed interest in receiving prescription medications for this. *Id.* Upon examination, he was found positive for depression, anxiety, fatigue, back pain, joint pain, and neck pain, and was started on Lexapro for his depression. Tr. 657-58.

On October 28, 2013, Borst had a appointment with Mr. Thomas Byrne, PA-C, to establish care. Tr. 611-14. Borst complained of pain and fatigue symptoms and reported that he experiences pain daily, with occasional flares which he described as feeling like "his joints are being pulled apart." Tr. 611. Borst reported taking Prednisone for pain flare-ups and Tramadol and Ibuprofen for daily pain management. *Id.* Mr. Byrne diagnosed Borst with a sleep disorder and chronic pain, which was described as "stable," and prescribed Mobic, Minocycline, Lexapro, hydroxychloroquine, and Tramadol. Tr. 613.

On November 26, 2013, Borst had an appointment with Dr.Dinning to discuss his medications and disability paperwork where she noted that Borst was taking Adderall for

narcolepsy, Lexapro for depression, and Plaquenil and Ultram for his connective tissue disorder. Tr. 653. Dr. Dinning also noted that Borst had recently seen a counselor who "thinks he has PTSD." *Id.* Dr. Dinning increased Borst's Adderall, continued his Lexapro, Plaquenil and Ultram, and encouraged him to see Dr. Dustin Dinning for an appointment to discuss switching medication for his connective tissue disorder after reporting that he was "not doing well." Tr. 654.

On December 16, 2013, Dustin Dinning, D.O., wrote a letter noting that he had been treating Borst for chronic fatigue, chronic pain, and fibromyalgia syndrome since February 28, 2013. Tr. 562, 735. Dr. Dinning noted that Borst's fatigue and musculoskeletal pain persisted despite the use of medications, and wrote he "foresee[s] these problems being persistent and refractory to medical treatment." *Id.* Overall, Dr. Dinning concluded that "[a]t this time, due to the severity of his symptoms, I don't think he can work any job." Tr. 735.

The following day, on December 17, 2013, Dr. Dustin Dinning wrote a letter noting that he would no longer serve as Borst's physician due to "frequent no shows" for his scheduled appointments. Tr. 563, 736.

On January 7, 2014, Borst had a follow-up appointment with Dr. Ramey for idiopathic hypersomnia. Tr. 556, 729. Dr. Ramey noted that Adderall was "now having decreased effectiveness," so he switched Borst back to Provigil. Tr. 558, 731. Dr. Ramey also noted that Borst was diagnosed with fibromyalgia and placed on Gabapentin by the rheumatology department, but was not tolerating the prescription well due to increased somnolence. Tr. 556, 729. Dr. Ramey suggested that Borst speak with Dr. Dustin Dinning for an alternative medication for his fibromyalgia pain. Tr. 558, 731.

On January 8, 2014, Dr. Ramey completed a Narcolepsy Disability Benefits Questionnaire where he diagnosed Borst with idiopathic hypersomnia. Tr. 751-63. Dr. Ramey wrote that Borst complained of excessive daytime sleepiness, "despite adequate total sleep time," and overall noted that Borst's narcolepsy affected his ability to work. Tr. 751-52.

On February 26, 2014, Borst had a follow-up appointment with Dr. Andrea Dinning where she noted that his De Quervain's tenosynovitis[6] was doing "much better," and Adderall and Flexeril were working well for his chronic fatigue and insomnia, respectively. Tr. 651. Borst was noted to be taking Venlafaxine for depression, but admitted to still having a depressed mood, so Dr. Dinning increased his Venlafaxine dosage. *Id.*

On March 26, 2014, Borst had a follow-up appointment with Dr. Andrea Dinning for his chronic fatigue syndrome and narcolepsy. Tr. 649-50. Dr. Dinning noted that Borst struggled daily with fatigue, but had a normal sleep study. Tr. 649. Borst was referred to Dr. Craig Weisenhutter for his fibromyalgia and told to continue with Adderall and Venflaxine for chronic fatigue syndrome and depression respectively. Tr. 649-50.

The following month, on April 22, 2014, Borst had another follow-up appointment with Dr. Andrea Dinning for his chronic fatigue syndrome and fibromyalgia. Tr. 647-48. Borst complained of dizziness, seeing spots, and occasional confusion, and that taking Provigil and Adderall together was making him "too sleepy." Tr. 647. Dr. Dinning ordered an MRI for Borst's confusion and dizziness. Tr. 648.

On April 29, 2014, Borst had an MRI taken of his brain. Tr. 665. Imaging results

---

[6] De Quervain's tenosynovitis is "a painful condition affecting the tendons on the thumb side of your wrist." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238.

showed "[n]egative enhanced and unenhanced MRI of the brain" with results that were unremarkable, with no abnormal findings. Tr. 665, 667.

On May 21, 2014, Borst had an appointment with Dr. Andrea Dinning for questions concerning his fibromyalgia. Tr. 644-46. Borst reported pain that "comes and goes" in his shoulders, wrist, and low back, and that he had taken a Hydrocodone which had helped. Tr. 644. He also requested a prescription of Paxil for his depression after reporting that his wife uses it and it had worked for him. *Id.* Dr. Dinning gave Borst a referral to Dr. Michael Coats for chronic fatigue syndrome, prescribed him Paxil for depression, and scheduled neurocognitive testing. Tr. 645.

That same day, Borst was referred to Dr. Daryl MacCarter for a second opinion and further evaluation of "migratory joint complaints and myalgias." Tr. 685-87. Dr. MacCarter wrote that Borst reported fatigue, somnolence, and low back pain, and was previously diagnosed with fibromyalgia. Tr. 685. Upon physical examination, Dr. MacCarter found Borst had "no tender points on joint exam suggestive of fibromyalgia," mild tenderness in both wrists, normal range of motion in his elbows and shoulders with mild range of motion in the right shoulder, mild loss of flexion in his lumbar spine, and tenderness in his low back and the sacroiliac joints. Tr. 686. Dr. MacCarter assessed Borst with probable rheumatoid arthritis and associated Sjogren's syndrome, and ordered x-rays and consideration of an MRI to check for bone marrow edema. Tr. 687.

On May 29, 2014, Borst returned for a follow-up appointment with Dr. Ramey where he found on examination that Borst "still has no other symptoms suggestive of narcolepsy including cataplexy, sleep paralysis, or hypnagogic/hypnopompic hallucinations." Tr. 620-22, 628-30. Dr.

Ramey wrote that Borst suffers from idiopathic hypersomnia, but noted that whether Borst "has another coexisting condition such as chronic fatigue syndrome is not entirely clear," and that he would not be able to make that diagnosis. Tr. 621, 629. Dr. Ramey also wrote that Borst had "seemed to develop a tolerance" to Adderall, which he was currently treating with. Tr. 620, 628.

On June 19, 2014, Borst had an follow-up appointment with Amy Ellsworth, PA-C for his migratory myalgias, arthralgias, and extreme fatigue. Tr. 641-43. Borst reported using Provigil and Adderall, but noted that Provigil caused extreme fatigue and the Adderall was no longer as effective as before. Tr. 641. Borst also presented with questions regarding exposure to polyhydrocarbons, and wondered if they were related to his symptoms. *Id.* Ms. Ellsworth prescribed Cymbalta for Borst's fibromyalgia, chronic fatigue syndrome, and depression and told Borst to stop taking Paxil. Tr. 643. Ms. Ellsworth also wrote that she would inquire about testing for polyhydrocarbon exposure after Borst was found to be positive for anti-nuclear antibody (ANA). *Id.*

On July 12, 2014, Borst had an appointment with Douglas Dero, D.O. for concerns regarding upper extremity symptoms. Tr. 631-32. Dr. Dero noted that Borst complained of tingling and pain, yet EMG results were negative. Tr. 631. Borst reported that he had "taken himself off all medications" and "was wondering if that was causing some problems." *Id.* Upon physical examination, Dr. Dero found that Borst's neck was unremarkable, he had no bony prominence tenderness, no muscle weakness by individual testing, and his upper extremities were neurovascularly intact. *Id.* Dr. Dero's impression was that Borst suffered from paresthesias and pain of both upper extremities and gave Borst a dose of Prednisone. *Id.* Dr. Dero did not recommend any other diagnostic tests, but did discuss having Borst get another MRI. *Id.*

On July 17, 2014, Borst had an appointment with Ms. Ellsworth, PA-C for follow-up care relating to an emergency room visit he made for tingling and numbness of his bilateral upper extremities. Tr. 637-40. Borst reported experiencing tingling in his fingers that morning, which became worst when lying down, and blurry vision. Tr. 637. Borst also reported that his memory problems "have worsened" and he needs to set reminders in order to remember to take his medication. *Id.* Borst requested a letter requesting supervision while at work and the ability to "access bed rest as needed for flare ups." *Id.* Ms. Ellsworth noted that Borst had recently ran out of Adderall and was using Hydroxycut to stay awake, which she discouraged and recommended that Borst continue to use Adderall. Tr. 637, 639. She wrote that Borst's stress could be contributing to his fatigue and noted that the paresthesia of his hand "appear[ed] to be improving," but she would schedule an MRI, per Borst's request, if the paresthesia continued. Tr. 639.

On July 28, 2014, Borst filed applications for Disability Insurance Benefits and Supplemental Security Income alleging disability beginning January 23, 20124. Tr. 339-40, 341-50.

On August 13, 2014, Borst had an appointment with Ms. Ellsworth with complaints of dizziness for two weeks, confusion, left arm pain, and chronic fatigue. Tr. 633-36. Borst described his dizziness as mild, and his confusion as "spontaneous and longstanding," and indicated he was worse during the last two weeks with "confusion, dizziness, headaches, paresthesia, and tingling." Tr. 633. Additionally, Borst described his pain as "aching and electrical," and was aggravated by lifting. *Id.* Borst noted that he had experienced a pain flare-up the week prior, which he tried to relieve with ibuprofen, ice, heat, and rest, but reported "little

Page 14 - OPINION AND ORDER

relief." *Id.* He requested pain medication for these pain flare-ups. *Id.* Ms. Ellsworth examined Borst and found no edema, normal memory, cranial nerves that were grossly intact, that he had an appropriate mood and affect, and was oriented to time, place, person, and situation. Tr. 635. She assessed Borst with dizziness, which she noted was resolved and had an unknown etiology; chronic fatigue syndrome, which was under "fair control with Adderall" and noted that stress may be adding to this; and addressed Borst's left arm pain, noting that it had resolved and she prescribed Norco and encouraged massage therapy. Tr. 635-36.

On September 18, 2014, Borst completed an Adult Function Report. Tr. 444-51. Borst wrote that his illnesses, injuries, or conditions affect his ability to work because he is unable to stay awake due to "narcoleptic symptoms caused by idiopathic hypersomnolence," and is unable to attend recovery "due to 'flare-up' symptoms, diffuse pain, [and] weakness associated with chronic fatigue syndrome." Tr. 444. Borst also wrote that he cares for his wife and children, cooks one meal a week, drives his children to school, completes "1-4 chores a day," including laundry, dishes, and vacuuming, yet noted that his wife helps care for their children when he "can't stay awake." Tr. 445. Borst reported being able to drive when his "meds are working" and gets out of the house by walking or driving. Tr. 447. Borst reported being able to shop in stores and online for food and household items, but was unable to pay bills, count change, handle a savings account, or use a checkbook because he "forget[s] things and misunderstands instructions," and had "double paid bills in the past." *Id.* Borst reported spending time with others, occasionally needing someone to accompany him when he goes places, and always having someone to help if he "ha[s] both kids with him." Tr. 448. He also reported having trouble getting along with people because his amphetamines make him irritable, reported having been

fired or laid off from a job, and had noticed unusual behaviors and fears including social anxiety, being easily startled, feeling down/depressed, and a lack of motivation. Tr. 449-50.

On September 19, 2014, Borst completed a Headache Questionnaire where he reported that he started having headaches beginning in March 2011 that have a "sporadic onset with no identifiable trigger." Tr. 464. He described these headaches as a dull pain with intermittent shooting pain in the front of his head and occasional blurred vision. *Id.* He wrote that he experienced headaches daily for one to twenty-four hours, migraines once a month, and that medications did not work to stop his headaches, but also noted that medications work in 45 minutes to an hour to stop headaches. *Id.*

On September 29, 2014, Ms. Ghita Borst, Borst's wife, completed a Third Party Function Report. Tr. 466-74. Ms. Borst reported seeing Borst on a daily basis and describing his daily routine including waking up and helping with the kids, yet needing "3 to 4 naps every day," noting that "he seems absent because he can never stay awake to help with chores and daily house tasks." Tr. 466. Mrs. Borst reported that Borst has a "hard time staying awake even with medication." Tr. 467. With respect to his personal care, Mrs. Borst reported having to remind Borst to bathe, and wash his hair, and that his illness has affected his hygiene because he can't keep up with laundry so he wears dirty clothes. *Id.* Mrs. Borst wrote that Borst cooks once a week, and Adderall helps him stay awake to cook, but "distracts him a lot." Tr. 468. She also wrote that Borst vacuums and sometimes cleans, but that she must "nag him" or give him more medicine "to get him to help." *Id.* Mrs. Borst notes that Borst can drive and go out alone, and is able to pay bills, handle a savings account, count change, and use a checkbook. Tr. 469. She reports that Borst spends time with others, but has problems getting along with people because

the Adderall "makes him manic and aggressive, depressed." Tr. 470. She wrote that Borst's flare-ups "cause a lot of pain and it can make him bedridden for days," noting that he has been fired, laid off, or missed work due to flare-ups, and naps are now part of his daily routine. Tr. 471-42.

On September 2, 2014, Borst had an appointment with Dr. Cooper Wester for complaints of hypersomnolence. Tr. 693-94. Borst reported that exercise made his somnolence worse, but medications made it better, although medications caused him to be "irritable and anxious." Tr. 693. Dr. Wester wrote that Borst had some fatigue and headaches, which were relieved by Tylenol, no double vision or difficulty walking, no joint swelling, redness, or decreased range-of-motion, and that Borst "appeared anxious with mild pressured speech along with disjointed conversation." *Id.* Dr. Wester assessed Borst with hypersomnolence, non-specific intermittent pain of unknown cause, and tachycardia. Tr. 694.

On September 19, 2014, Mr. Tony Thompson, Licensed Clinical Social Worker, submitted a letter on Borst's behalf writing that he completed an in-depth personality and psychological profile of Borst after Borst's arrest for Domestic Battery. Tr. 688. Mr. Thompson found that Borst's profile "suggested cognitive issues related to schizophrenic thought processes, a high level of post-traumatic stress, intense somatic concerns, generalized anxiety and on again/off again depressed moods." Tr. 688. Mr. Thompson noted that the "primary mental/cognitive issue we were not able to adequately resolve was a loss of memory, primarily short-term but including some long-term memory deficits." *Id.* Mr. Thompson wrote that he "[did] not believe [Borst] can gain and maintain meaningful employment at this time," finding that Borst's "memory and episodes of 'invasive thinking' would make holding a job extremely

difficult, due to not being able to consistently focus on tasks at hand and how these tasks fit into the employer's requirements for employees." *Id.*

On September 30, 2014, Borst returned to Dr. Wester with complaints of hypersomnolence. Tr. 691. Dr. Wester noted "excess fatigue without fever and chills," and assessed Borst with hypersomnolence by history, and bilateral forearm pain, which he prescribed Norco for treatment. *Id.*

On October 6, 2014, Borst had another follow-up appointment with Dr. Wester where he requested medication for his depression. Tr. 689. Dr. Wester noted that Borst "had previously done well on Paxil in conjunction with his Adderall," but did have "some ups and downs when he forgot his dosing." *Id.* Dr. Wester also noted Borst's continued chronic fatigue, hypersomnolence, bilateral hand numbness, "tingling, and dysfunction with some form of clumsiness." *Id.* Dr. Wester prescribed a trial of Celexa for Borst's depression, and recommended an MRI for his spine to assess Borst's bilateral hand and thumb tingling. *Id.*

On October 9, 2014, the Agency determined Borst was not disabled for purposes of the Act. Tr. 140, 141, 205-09, 210-14.

On October 22, 2014, Borst underwent an MRI of his spine after complaints of bilateral hand tingling and finger numbness. Tr. 695-96. Findings showed Borst's "cervical vertebral bodies are normal in height and alignment," he had "[n]o cervical spinal canal stenosis," mild right neural foraminal narrowing caused by a small lateral disc bulge at C5-6, and no intrinsic spinal cord lesion. Tr. 695.

On October 28, 2014, Borst requested reconsideration of the Agency's findings of non-disability. Tr. 216-17.

On November 25, 2014, the Agency found on reconsideration that Borst was not disabled for purposes of the Act. Tr. 218-23, 224-29.

On December 3, 2014, Borst requested a hearing before an ALJ. Tr. 230.

On December 12, 2014, Dr. Andrea Dinning, submitted a letter noting that she "erroneously wrote in [her] progress note from 3/26/14 that [Borst] suffered from narcolepsy," and "[u]pon further review, he does not suffer from narcolepsy but does have idiopathic hypersomnolence." Tr. 534, 697, 728.

On December 16, 2014, Borst had an appointment with Dr. MacCarter who assessed him with back pain and chronic fatigue syndrome. Tr. 707-09. Dr. MacCarter noted that there was no evidence of rheumatoid arthritis, ankylosing spondylitis or Sjogren's syndrome or any other rheumatic disease such as lupus. Tr. 709.

On January 7, 2015, Dr. Ramey submitted a letter on Borst's behalf noting that Borst's multiple sleep latency tests from 2012 were "consistent with daytime sleepiness despite adequate sleep but was not diagnostic for narcolepsy." Tr. 698. Dr. Ramey also noted that Borst's "polysomnogram was fairly unremarkable with the exception of very mild obstructive sleep apnea," and Borst's profound daytime somnolence required multiple stimulant medications. *Id.*

On January 8, 2015, Dr. Stuart Denny submitted a letter on Borst's behalf. Tr. 699. In his letter, Dr. Denny noted that he had not seen Borst since May 30, 2014, but that he was asked to review a December 12, 2014 rheumatology note from Dr. MacCarter and a December 15, 2014 memorandum from Col. Elizabeth Hersch. *Id.* Dr. Denny wrote that chronic fatigue syndrome is "the most reasonable current working diagnosis" of Borst's condition, that he fits the CDC criteria for CFS, and "previous general medical evaluations, and recent thorough neurologic and

rheumatologic evaluations have failed to provide an alternative diagnosis." *Id.*

On January 20, 2015, a VA Disability Rating Verification printout showed Borst's chronic fatigue syndrome with idiopathic hypersomnia was given a total combined disability rating of 40%. Tr. 750.

On February 19, 2015, Borst had another appointment with Dr. MacCarter where he assessed Borst with chronic fatigue syndrome and recommended that he see a pain specialist. Tr. 704-06.

On February 26, 2015, Dr. Wester completed a Physical Residual Function Capacity Statement on behalf of Borst. Tr. 700-04. Dr. Wester diagnosed Borst with chronic fatigue syndrome and gave Borst a "fair" prognosis noting that Borst's symptoms included hypersomnia, fatigue, diffuse pain, poor concentration, intermittent memory loss, and headaches, and characterized Borst's pain to be acute/shooting, diffuse, and having an unknown cause. Tr. 700. Dr. Wester found Borst's depression and anxiety affected his physical condition and checked the box that Borst's pain would constantly be severe enough to interfere with the attention and concentration needed to perform simple work tasks. *Id.* Dr. Wester found that Borst could occasionally walk one city block without rest or severe pain, had no problems climbing stairs, stooping, crouching, and bending, but would have problems balancing. Tr. 701. Dr. Wester believed Borst needed to lie down for one to six hours a day in an 8-hour workday because of fatigue and pain, and could sit for two hours, stand for ten minutes, walk for fifteen minutes at a time, could sit for seven hours, and could stand less than one hour in a workday. *Id.* Dr. Wester found Borst would need to take one to three unscheduled breaks during an eight-hour workday, and would need to lie down during these breaks. Tr. 702. He found Borst could rarely lift five,

ten, fifteen, and twenty pounds, rarely carry fifteen pounds, and could frequently carry less than five pounds. *Id.* Finally, Dr. Wester wrote that he believed Borst would be off-task more than 30% of the time, and would be absent from work, or unable to work five days or more a month. Tr. 703. Overall, Dr. Wester found Borst would be unable to obtain and retain work in a competitive environment, eight hours per day, five days per week. *Id.*

On March 26, 2015, Mrs. Ghita Borst submitted a Statement in Support of Claim. Tr. 548. In her report, Mrs. Borst explained that Borst's complaints of pain and fatigue had started in 2012, and that he attempted to work despite his impairments, but was let go because of his "flare ups." *Id.* She wrote that Borst takes Adderall to function for a few hours, but will "crash and be back to sleep." *Id.* She further noted that Borst tried to increase his Adderall dosage to stay awake for work, but has become "resistant to the Adderall and the drug lost effect." *Id.* She wrote that Borst had started to complain of bad chest pains and difficulty breathing, and that his memory is "not the same anymore," noting that he "leaves the stove on or forgets to take the trash to the street or leaves his keys in the mail box or drops his wallet." *Id.* Finally, she noted that Borst can "sleep for two days straight and would still be tired after he woke up." Tr. 549.

On April 16, 2015, Borst had a hearing before the ALJ. Tr. 73-113. He testified to suffering from chronic fatigue and pain. Tr. 93, 95-97, 101-02. The ALJ asked vocational expert ("VE") Sharon Welter to identify Borst's past relevant work, which the VE identified included children's institution attendant, volunteer information clerk, artillery or naval gun fire observer, sales clerk, and clinical counselor. Tr. 105-08. Next, the ALJ asked the VE to consider a younger individual with a college degree, work experience, and functional limitations including "limited to sedentary work, postural at occasion, except ladders, ropes, and scaffolds never;

pushing and pulling, overhead reaching, handling, and fingering all bilaterally. It would all be limited to frequent." Tr. 108. Additionally, the individual would need to "[a]void concentrated exposure to extreme cold, vibration, and all exposure to hazards." *Id.* The ALJ asked whether such a person could perform any of Borst's past relevant work, and the VE testified such limitations would allow an individual to perform the job of clinical counselor, both as performed and as listed in the Dictionary of Occupational Titles ("DOT"), along with the positions of call-out operator and telemarketer. Tr. 108-09.

On April 24, 2015, the ALJ issued her decision finding Borst was not disabled from January 23, 2014 through the date of the decision. Tr. 177-90.

On April 27, 2015, Dr. Ray Smith evaluated Borst, whose chief complaint on examination was chronic fatigue. Tr. 718. Dr. Smith wrote that Borst's current complaints included irritability since the onset of depression. *Id.* Dr. Smith performed the MMSE test on Borst, who scored 26, which indicated mild cognitive loss. Tr. 720. Dr. Smith screened Borst using the posttraumatic stress diagnostic scale where he found the number of symptoms endorsed was 11 of 17, which was rated as severe. *Id.* Finally, Dr. Smith evaluated Borst using the Liebowitz Social Anxiety Scale, and found Borst's scores reflected "Marked Social Phobia, with severe avoidance." *Id.* Overall, Dr. Smith diagnosed Borst with PTSD, depressive disorder, dysthymic disorder, generalized anxiety disorder, and agoraphobia. Tr. 723.

On April 29, 2015, Borst had a Physical Profile completed by Heidi Munro, APA-C. Tr. 559-60, 732-33. The profile noted that Borst was unable to complete the following Functional Activities: carrying and firing the assigned weapon, evading direct and indirect fire, wearing body armor for at least 12 hours per day, load bear equipment for 12 hours in a day, moving

40lbs while wearing usual protective gear at least 100 yards, and living in an austere environment without worsening the medical condition. Tr. 559, 732.

On May 14, 2015, Dr. Wester submitted a clarifying letter noting that the February 26, 2015 Physical Residual Functional Capacity Statement was completed by him on that date. Tr. 737, 564.

On May 20, 2015, Dr. Smith completed a  Mental Residual Functional Capacity Statement. Tr. 550-53, 741-44. Dr. Smith diagnosed Borst with PTSD, depression, dysthymia, and anxiety, and gave Borst an overall prognosis of "poor." Tr. 550, 741. Dr. Smith completed a check-box form finding that Borst's mental abilities in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, being punctual and within customary tolerances, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from a psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and traveling in unfamiliar places or using public transportation would all preclude performance for 15% or more of an 8-hour workday. Tr. 550-52, 741-43. Dr. Smith further wrote that noise and Borst's memory lapses, bowel control, inability to remember what day and time his is supposed to work without reminders, inability to stay on task, inability to express ideas or convey information in-person or through technology would affect his ability to work at a regular job on a competitive and sustained basis in an 8-hour work day for 5 days per week. Tr. 552, 743. Dr. Smith also wrote that Borst's anxiety and depression exacerbated his chronic pain, and it worsened psychological problems and his ability

to cope. *Id.* Overall, Dr. Smith wrote that more than 30% of an 8-hour work day, 5 days per week, in a competitive work environment Borst would be precluded from performing a job, or be "off task" due to his physical and mental limitations. *Id.* Dr. Smith wrote that he believed Borst would be unable to obtain and retain work in an competitive work environment, noting that Borst would likely be absent or unable to work more than 6 days per month. Tr. 552-53, 743-44.

That same day, Dr. Smith conducted a Psychosocial Evaluation. Tr. 535-37, 738-40. Upon examination, Dr. Smith found Borst's approach to the MMPI-2 test were "somewhat inconsistent," noting that some of Borst's responses "suggest carelessness or inattention to content." Tr. 535, 738. Dr. Smith noted that Borst's "depressed mood is accompanied by physical complaints and extreme fatigue." *Id.* Dr. Smith found Borst had "difficulty managing routine affairs, and the items he endorsed suggest a poor memory, concentration problems, and an inability to make decisions." *Id.* Dr. Smith noted that "[t]he most frequent diagnosis for individuals with this profile type is Dysthymic Disorder." Tr. 536, 739. Overall, Dr. Smith wrote that Borst is "unable to deal with his physical and mental problems enough to function adequately at home or at any job. He lacks the coping abilities needed to improve his situation." Tr. 537, 740. Dr. Smith recommended Borst seek grief counseling, anger management training, and assertiveness skills training. *Id.*

On June 4, 2015, Borst timely requested review of the ALJ's decision. Tr. 268-69.

On June 15, 2015, Dr. MacCarter, M.D. evaluated Borst and completed a Chronic Fatigue Syndrome Disability Benefits Questionnaire. Tr. 764-67. He wrote that Borst suffered from chronic fatigue syndrome and idiopathic hypersomnia, noting that Borst had an acute onset of chronic fatigue syndrome in February 2011. Tr. 764. Dr. MacCarter wrote that Borst had

debilitating fatigue, generalized muscle aches and weakness, migratory joint pain, neuropsychologic problems, sleep disturbance, poor attention, an inability to concentrate, forgetfulness, and confusion associated with his chronic fatigue syndrome. Tr. 765. Dr. MacCarter further opined that Borst's fatigue would reduce his daily activities to less than 50%. Tr. 764. Dr. McCarter found Borst's symptoms wax and wane, but they"are so severe as to restrict routine daily activities almost completely," and would lead to at least ten days of incapacitation a month. Tr. 765.

On July 10, 2015, the Social Security Administration issued a Notice of Order of Appeals Council Remanding Case to Administrative Law Judge. Tr. 196-201. The Appeals Council vacated the hearing decision and remanded the case for further proceedings. Tr. 198.

On October 9, 2015, a Physical Profile was completed by Ms. Munro. Tr. 748-49. The profile noted that Borst was unable to complete the following Functional Activities: carrying and firing the assigned weapon, evading direct and indirect fire, wearing a helmet or body armor for at least 12 hours per day, moving 40lbs while wearing usual protective gear at least 100 yards, and living in an austere environment without worsening the medical condition. Tr. 748.

On November 4, 2015, a second hearing was held before the ALJ. Tr. 44-72. Mr. Borst waived his appearance at the hearing because he was currently living in Morocco, but his attorney Randi Johnson was present. Tr. 44. Testimony was obtained from a medical expert, Dr. Margaret Moore. Tr. 47-59. Dr. Moore testified that in her medical opinion, there was no mental health medically determinable impairment, and Borst's impairments were primarily physical. Tr. 48. She testified that she was "skeptical" of Dr. Smith's finding that Borst suffered from PTSD. Tr. 49-50. Dr. Moore continued to testify that a diagnosis "of some form of anxiety

makes some sense," but she "did not understand" the diagnosis of agoraphobia, noting that Borst leaves the house. Tr. 50. She also noted that the record did not "really weigh in very much in terms of depression," noting requests for anti-depressant medication, but that Borst would discontinue using it, noting "no consistent medication treatment even for depression." Tr. 50-51. Dr. Moore also did not believe the diagnosis of dysthymic disorder. Tr. 51. Dr. Moore testified that only depressive disorder, listing 12.04, and generalized anxiety disorder, listing 12.06 were supported by the record. Tr. 51. The ALJ asked Dr. Moore about the need for a consultative examination, but she testified that Borst had essentially done that by seeking out an examination from Dr. Smith. Tr. 52.

At the hearing the ALJ questioned a VE for clarification regarding Borst's past relevant work, which the VE noted were all the same from the previous hearing, except clinical counselor was replaced with social service worker, which more consistently described Borst's past relevant work. Tr. 66. The ALJ further questioned the VE and asked whether a person limited to sedentary work, "pushing and pulling bilaterally is going to be limited to frequent. Posturals are all at occasional except ladders, ropes, and scaffolds never. Overhead reaching bilaterally, handling and fingering bilaterally are all limited to frequent. And avoid concentrated exposure to extreme cold and vibration," must "avoid all exposure to hazards," and "interaction with the public should be limited to only brief, superficial, and occasional," and "should be in no large groups or crowds and he should independently with no collaboration work with coworkers" could perform any of Borst's past relevant work, to which the VE replied "no." Tr. 66-67. The ALJ further asked the VE whether a person with that profile could complete other work in the national economy, to which the VE testified that based on transferable skills there was no other

work in the national economy, but with respect to unskilled work a person with the above profile could perform jobs in the assembly occupations category including electronics worker; jobs in the records clerks category including call-out operator; and jobs in the hand packers and packagers category, including hand bander. Tr. 68-69.

On November 27, 2015, the ALJ issued a second decision finding Borst was not disabled from January 23, 2014 through the date of the decision. Tr. 14-41.

On January 4, 2016, Mrs. Borst submitted a letter to the ALJ noting that Borst's condition has not improved since it intensified in October 2014, and his condition causes him to be "fatigued every day," and that he sleeps more than fifteen hours in a day, and "experiences recurring pain daily." Tr. 588. She wrote that they moved to Morocco to live with her parents because they did not have a home. *Id.* Mrs. Borst wrote that Borst experiences pain in his arms and legs that restrict his ability to leave the home at least three times a week, and that his amphetamines have "lost their effectiveness over time." *Id.* She finally reported that a "near accident" led to the decision that it is "irresponsible to allow him to drive," noting that she takes him to all of his medical appointments. *Id.*

On January 29, 2016, Borst timely requested review of the ALJ's November 23, 2015 decision, and the Appeals Council denied his request for review on April 28, 2016. Tr. 1-7, 13. In consequence, the ALJ's decision on November 27, 2015 became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. §422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found that Borst did not engage in substantial gainful activity since January 23, 2014, the alleged onset date. Tr. 20. She therefore proceeded appropriately to the second step of the analysis.

At the second step, the ALJ found that Borst's medical impairments of chronic fatigue syndrome, C5-6 foraminal narrowing, De Quervain's tenosynovitis in the left upper extremity, idiopathic hypersomnolence, headaches, generalized anxiety disorder, and depression secondary to medical concerns were "severe" for purposes of the Act. Tr. 20-23. Because Borst had severe impairments, the ALJ properly proceeded to the third step of the analysis. *Id.*

At the third step, the ALJ found that none of Borst's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, Subpart P. App. 1. Tr. 23-25. Specifically, the ALJ found that Borst's impairments did not meet Listing 1.02 (Major dysfunction of a joint(s) (due to any cause)); Listing 1.04 (Disorders of the spine); Listing 14.06 (Undifferentiated and mixed connective tissue); Listing 14.09 (Inflammatory arthritis); Listing 12.00 (Mental disorders); and Listing 11.00 Neurological. Tr. 24.

At the third step the ALJ also considered Borst's mental impairments and found they did not "meet or medically equal the criteria of listings 12.04 and 12.06." *Id.* In making this finding, the ALJ evaluated Borst using the paragraph B criteria and considered the medical opinions of Dr. Moore and found Borst had "none to mild restrictions of activities of daily living; mild to moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation, each of extended duration." *Id.* The ALJ therefore properly conducted an assessment of Borst's residual functional capacity ("RFC").

Regarding Borst's RFC, the ALJ found that Borst has:

the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Pushing/pulling bilaterally is limited to frequent. He can occasionally engage in climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling, but never climb ladders, ropes, or scaffolds. Overhead reaching bilaterally and handling and fingering bilaterally are limited to frequent. He should avoid concentrated exposure to extreme cold and vibration. He must avoid all exposure to hazards due to hypersomnolence. Interaction with the public should be limited to brief, superficial, and occasional. There should be no stressful interactions with the public (i.e., no conflict resolutions or customer service problem solving). He should not be in large groups or crowds. He should work independently, with no collaborative work with coworkers.

Tr. 25. In reaching these findings, the ALJ considered all of the material objective medical evidence in the record bearing directly upon Borst's asserted impairments, as well as Borst's own statements regarding his symptoms. Tr. 25-31.

At the fourth step of the five-step process, the ALJ found that Borst was not capable of performing his past relevant work as an attendant at a children's institution, information clerk volunteer, body guard (military), artillery observer, sales clerk, or social service worker. Tr. 32. At the fifth step, the ALJ found that in light of Borst's age, education, work experience, and RFC that there were jobs that existed in significant numbers in the national economy that the claimant can perform. Tr. 32-34. On that basis, the ALJ concluded that Borst was not disabled from January 23, 2014, through the date of her decision. Tr. 34.

## ANALYSIS

Borst challenges the Commissioner's conclusion that he is not disabled on several grounds. Borst argues the ALJ erred by: (1) failing to provide a clear and convincing reason to discredit Borst's subjective symptom testimony; (2) failing to provide a germane reason to discredit the lay witness testimony of Mrs. Ghita Borst; (3) improperly rejecting the medical

opinions of treating physician Dr. Cooper Wester, and examining provider Dr. Ray Smith; (4) failing to provide a legally sufficient reason for rejecting the medical opinion of LCSW Tony Thompson; (5) presenting a hypothetical to the VE that did not incorporate all of his alleged limitations; and (6) in the alternative, that remand is required under sentence six. The court addresses each issue below.

## I.     Sentence Six Remand

As an initial matter, the court addresses Borst's argument concerning his request for remand under sentence six. Borst argues that the court should "reverse and remand the case for consideration of new and material evidence, pursuant to 42 U.S.C. § 405(g), sentence six" based upon an exhibit from November 9, 2016 showing a Veterans Administration determination that Borst is "unemployable." Pl.'s Opening Br. 20.

Sentence six remands may be ordered in two situations: "where the Commissioner requests a remand before answering the complaint, or where new, material evidence is adduced that was for good cause not presented before the agency." *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002). In cases involving the presentation of new evidence, "the court examines both whether the new evidence is material to a disability determination and whether a claimant has shown good cause for having failed to present the new evidence to the ALJ earlier." *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001). Materiality means the new evidence must "bear directly and substantially on the matter in dispute." *Id.* (quoting *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982). In addition, the new evidence must "demonstrate that there is a 'reasonable possibility' that the new evidence would have changed the outcome" of the decision. *Id.*

Here, Borst submitted new evidence attached to his Plaintiff's Opening Brief. Pl.'s Opening Br. Plaintiff's Exhibit 1 - Page 1. The evidence consisted of a letter from the Veterans Administration dated November 9, 2016 which gave a summary of benefits that Borst was "currently reciev[ing] from the Department of Veterans Affairs." *Id.* The letter showed Borst was given a 60% disability rating, but was paid out at the 100% rate because the VA determined he was "unemployable due to [his] service-connected disabilities." *Id.* Borst argues that the court should remand the case under sentence six for "consideration of new and material evidence," arguing that his exhibit shows he is "unemployable." Pl.'s Opening Br. 20, Pl.'s Reply Br. 10.

The court finds no reason to remand this case under sentence six, noting that the new evidence is not material to the matter in dispute. Here, the Veterans Administration finding of Borst's 60% service-connected disability was made on November 9, 2016, almost three years after Borst's alleged disability onset date of January 23, 2014. Additionally, the ALJ considered the VA disability rating from January 20, 2015, which pertained to the relevant time period. *See McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) ("[A]n ALJ must ordinarily give great weight to a VA determination of disability."). As the ALJ considered the VA disability rating from the relevant time period, and the new evidence is not material to the issue in dispute, the court finds the ALJ was not required to remand the case under sentence six.

## II. Subjective Symptom Testimony

Next, Borst argues that the ALJ erred by finding his subjective symptom testimony was only partially credible. Pl.'s Opening Br. 16-18, Pl.'s Reply Br. 6-8.

If "there is no affirmative evidence of malingering, 'the ALJ can reject the claimant's

testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (quoting *Smolen*, 80 F.3d at 1281, 1283-84). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which...testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

Here, the ALJ found Borst's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] only partially credible." Tr. 25-26. The ALJ wrote that Borst's "claims of total disability under the Social Security Act is simply not supported by the weight of evidence..." Tr. 26.

First, the ALJ discredited Borst's subjective symptom testimony noting that he sought very little mental health care and "made very little mention of significant symptoms in the treatment notes contained in this record." *Id.* Specifically, the ALJ found that Borst did not seek care from Dr. Smith until April 27, 2015, "three days AFTER the [first ALJ] decision was issued." *Id*, (emphasis in original). The court rejects this reason for discrediting Borst's subjective symptom testimony. An independent review of the record shows Borst sought mental health treatment as early as October 2013, when he complained to Dr. Andrea Dinning of depression and anxiety, and expressed an interest in receiving prescription medication for his mental health symptoms. *See* Tr. 656. After his October 2013 visit, there are numerous medical records showing Borst continued to seek mental health treatment from Dr. Andrea Dinning, Mr.

Thompson, and Dr. Wester, and began taking medications for his mental health symptoms, all prior to his April 2015 meeting with Dr. Smith. *See* Tr. 644-46, 651, 653, 656, 688-89. Because Borst sought mental health treatment prior to his initial meeting with Dr. Smith, the court rejects this reason for discrediting Borst's subjective symptom testimony.

Next, the ALJ found Borst's diagnostic test results relating to his reports of chronic symptoms of pain, fatigue, hypersomnolence, headaches, and upper extremity numbness were generally unremarkable and contained little evidence to support his alleged symptoms. Tr. 26. Specifically, the ALJ cited negative sleep studies and sleep latency tests, negative brain MRI and EMG/nerve conduct studies, and unremarkable physical examinations. *Id.*, citing Tr. 615, 665, 695, 698, 707. Although lack of medical evidence can be a reason for rejecting a claimant's subjective symptom complaints, it cannot be the sole reason for rejecting those complaints. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). As the court finds the ALJ provided no other clear and convincing reason for discrediting Borst's subjective symptom testimony, this reason alone is not enough to discredit Borst's subjective symptom testimony.

Third, the ALJ found that Borst's sleepiness and fatigue were controlled by medication. Tr. 26, citing Tr. 615, 661, 689-94. Although some medical records show medication effectively controlled Borst's fatigue at some times, other evidence in the record show medications were no longer effective and that Borst had developed a tolerance to them. *See* Tr. 468, 548, 556, 620, 628, 635-36, 641, 647-48, 729. Therefore, the court finds this is not a clear and convincing reason, supported by the substantial evidence, to reject Borst's subjective symptom testimony.

Next, the ALJ discredited Borst's subjective symptom testimony finding that he had a poor work history, noting that Borst had only worked a few years at substantial gainful activity

levels, and his "sporadic employment history suggests he has little motivation for full-time employment." Tr. 27. The ALJ also noted that Borst was active with the National Guard. *Id.* The court does not find these reasons persuasive, noting that Borst and his wife, Mrs. Ghita Borst, both reported that despite his attempts to work, that Borst had been laid off or fired from jobs because of his chronic pain flare-ups, further supporting his subjective symptom testimony concerning his impairments. *See* Tr. 93, 449-50, 471-72, 548.[7] *See Reddick*, 157 F.3d at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). Additionally, Borst testified that his service for the National Guard consisted of attending a monthly meeting, but that he has no responsibilities and would spend meetings resting or even sleeping. Tr. 94-95. Borst and his wife's testimony support the limitations caused by his alleged impairments, and the court does not find his poor work history is a clear and convincing reason to discredit his subjective symptom testimony.

Finally, the ALJ found that Borst had been inconsistent with seeking medical treatment and was non-compliant with his medications, citing evidence that Borst was discharged from Dr. Dustin Dinning's medical care, was not seen by Dr. Ramey for over a year, and there was an indication of "medication non-compliance." Tr. 27, citing Tr. 721, 729, 736. The court does not find Borst's discharge from Dr. Dustin Dinning's medical care for" no shows," or Borst's alleged "medication non-compliance" are clear and convincing reasons to discredit Borst's subjective symptom testimony. Borst testified that his alleged impairments caused him to forget things,

---

[7]The court notes that the weight the ALJ gave to the testimony of lay witness, Mrs. Ghita Borst, was in dispute. Although the court finds the ALJ provided germane reasons to discredit Mrs. Borst's testimony, the finding here that Mrs. Borst's testimony contradicts the ALJ's findings is consistent with the ALJ overall giving her testimony only partial weight.

which would explain his "frequent no shows," that caused Dr. Dustin Dinning to discharge him, and his medication non-compliance. Additionally, the court finds the fact that Borst had not been seen by Dr. Ramey for a year was not a clear and convincing reason to discredit his subjective symptom testimony because there was no indication from Dr. Ramey that Borst had reason to attend appointments more consistently. Therefore these are not clear and convincing reasons to discredit Borst's subjective symptom testimony.

Overall, the court finds the ALJ erred by failing to provide a clear and convincing reason supported by substantial evidence to discredit Borst's subjective symptom testimony.

### III.    Lay Witness Testimony

Next, Borst argues that the ALJ erred by improperly addressing the lay witness statement of his wife, Mrs. Ghita Borst. Pl.'s Opening Br. 19, Pl.'s Reply Br. 8-9.

Lay testimony as to a plaintiff's symptoms is competent evidence which the ALJ must take into account. *Tobeler v. Colvin*, 749 F.3d 830, 832-34 (9th Cir. 2014), *Dodrill*, 12 F.3d at 919. If the ALJ disregards such testimony, the ALJ "must give reasons that are germane to each witness." *Id.* Inconsistency with medical evidence is one such reason. *Id.*

Here, the ALJ considered Mrs. Bort's testimony and gave it "partial weight." Tr. 28. The ALJ determined Ms. Borst's statements suggested a greater impairment than the medical record supported, overall finding that her statements were not based on medical expertise, likely reflected Borst's symptomatological reports that exceed the objective evidence, and were "wholly inconsistent" with the reports of Dr. Panek and Dr. Moore, the state agency medical consultants, and the "numerous benign test results noted in the record." Tr. 28.

First, the mere fact that Mrs. Borst's statements are not based on medical expertise is not

a germane reason to discredit her opinion. *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) ("[M]edical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence . . . . However, lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence . . . and therefore cannot be disregarded without comment.").

Second, the court finds the ALJ's finding that Mrs. Borst's testimony "likely reflect[s] the claimant's symptomatological reports that exceed the objective evidence" was not a germane reason to discredit it. Although a germane reason for discrediting lay testimony is that it is substantially similar to a claimant's validly discredited allegations, here the ALJ failed to provide a legally sufficient reason for discrediting Borst's subjective symptom testimony, meaning this was not a legally sufficient reason to discredit Mrs. Borst's testimony. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

Finally, the court finds that the ALJ's determination that Mrs. Borst's testimony was "wholly inconsistent" with the reports of Dr. Panek and Dr. Moore, the state agency medical consultants, was in error.[8] *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (a germane reason to discredit lay witness testimony is that it conflicts with medical evidence). Therefore, the ALJ did not provide a legally sufficient reason for giving only partial weight to the lay witness testimony of Mrs. Borst.

///

---

[8]The court notes that the ALJ also discredited Mrs. Bort's lay witness opinion finding that is was inconsistent with the "numerous benign test results noted in the record." As the court later finds in this opinion, Borst's benign test results did not contradict his complaints and the medical record as a whole. For this reason, the court did not find this was a good reason to discredit Mrs. Borst's testimony.

## IV.    Medical Opinion Evidence

Next, Borst argues that the ALJ erred by failing to provide a legally sufficient reason for rejecting the medical opinions of treating physician, Dr. Cooper Wester, and examining physician, Dr. Ray Smith. Pl.'s Opening Br. 10-16, Pl's Reply Br. 1-6.

An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Holohan v. Massanari*, 246 F.3d 1195, 1202, (9th Cir. 2001) (citing *Reddick*, 157 F.3d at 725 (9th Cir. 1998)). If contradicted, the ALJ may reject the opinion with specific and legitimate reasons supported by substantial evidence in the record. *Holohan*, 246 F.3d at 1202; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

### A.    *Treating Physician, Dr. Cooper Wester*

First, Borst argues that the ALJ erred by giving no weight to the medical opinion of Dr. Wester, arguing that the ALJ failed to provide a clear and convincing reason to reject the doctor's opinion. Pl.'s Opening Br. 11-13, Pl.'s Reply Br. 1-3.

Here, the ALJ gave "no weight" to Dr. Wester's February 2015, medical opinion that Borst was "unable to complete an 8-hour workday, would be absent from work more than five days per month, and would be off task more than 30% of the workday." Tr. 29. The ALJ found Dr. Wester's medical opinion was "wholly inconsistent" with his own treatment notes in Exhibit 10F. *Id.* The court rejects the ALJ's finding, noting that although Dr. Wester's medical records in Exhibit 10F from 2014 show Borst was doing well on medication, an independent review of the record shows Borst built up a tolerance for his medication and found it was no longer effective. *See* Tr. 92, 468, 548, 556, 620, 628, 635-36, 641, 647-48, 729. This change in Borst's

medical status would explain the alleged inconsistency in Dr. Wester's findings from February 2015, which were made over a year later from his reports in Exhibit 10F. An ALJ may not simply pick evidence to support the conclusion that a plaintiff is not disabled; rather, the ALJ must consider the evidence as a whole in arriving at a conclusion of disability. *See Holohan*, 246 F.3d at 1207. As the ALJ failed to consider the record as a whole, the court finds this was not a legally sufficient reason to reject the medical opinion of Dr. Wester.

Next, the ALJ rejected Dr. Wester's medical opinion finding it was "inconsistent with the numerous benign test results" noting the existence of "normal sleep studies, normal EMG/NCSs, a normal brain MRI, and normal laboratory findings." Tr. 30. However, this court rejects this reason for discrediting Dr. Wester's medical opinion. First, the ALJ noted only instances in the medical record that showed Borst doing well, but failed to mention reports in the medical record where Borst was reported to be suffering from pain, tested positive for connective tissue disease, and was found to suffer from chronic fatigue syndrome. *See* Tr. 612, 631, 654, 657, 661-62, 686-87, 693, 699, 706, 709, 735, 765. Additionally, the court notes that Borst's medical providers found he suffered from "idiopathic hypersomnolence," which the ALJ recognized meant Borst's condition arose from "unknown causes." Tr. 26; *see also* Tr. 620-21, 624-29, 697-698, 728-29, 731, 751. Because Borst's medical providers found his condition had unknown causes, this court finds benign test results are not inconsistent with Dr. Wester's overall findings, and therefore finds the ALJ erred in relying on Borst's benign test results to discredit the medical opinion of Dr. Wester. Therefore, the ALJ failed to provide a legally sufficient reason to reject Dr. Wester's medical opinion.

///

B.    *Examining Physician, Dr. Ray Smith*

Next, Borst argues that the ALJ erred by giving only "limited weight" to the medical opinion of Dr. Smith. Pl.'s Opening Br. 14. Pl's Reply Br. 1, 4-6.

Here, the ALJ gave "limited weight" to Dr. Smith's medical opinion finding they were "quite extreme." Tr. 31. First, the ALJ found Dr. Smith's findings that Borst was "unable to remember...unable to express ideas or convey information" were inconsistent with Borst's activities of daily living which included remaining active in the National Guard, caring for his children, driving, shopping, and completing a limited number of household chores. *Id.*, citing Tr. 444-51. "[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 F.3d at 1041-42 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)). Inconsistency between a treating provider's opinion and a claimant's daily activities may constitute a specific and legitimate reason to discount that opinion. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-02 (9th Cir. 1999)).

Next, the ALJ found that Dr. Smith's diagnostic conclusions were contradicted by Dr. Moore, the medical expert in clinical psychology including: (1) that Dr. Smith diagnosed PTSD, but "the diagnostic criteria for PTSD required under the DSM-V has never been set forth in the medical evidence of record," (2) Dr. Smith's diagnosis of agoraphobia was not supported by the anything other than Borst's assertions, writing that "this record documents he is NOT homebound, i.e., he takes his kids out, he attends medical appointments, he in fact recently traveled to Morocco," (3) Dr. Smith's diagnosis of dysthymia, defined by the DSM-V as "a longtime, low level , ongoing depression" was contradicted by the record which shows "NO

evidence of depression prior to 2014," and (4) despite Dr. Smith's note that Borst "provided unrealistic answers" on his MMPI, Dr. Smith still gave limitations which were consistent with Borst's elevated MMPI scores. Tr. 31. *See Bray*, 554 F.3d at 1228 ("[T]he ALJ need not accept physician's opinions that are inadequately supported by the record.) The reasons the ALJ provided for discrediting Dr. Smith are supported by the record, and in sum, the ALJ provided a specific and legitimate reason to discredit the medical opinion of Dr. Smith.

## V.     Other Medical Opinion Evidence

Next, Borst argues that the ALJ erred by giving only "some weight" to the medical opinion of LCSW Tony Thompson. Pl.'s Opening Br. 13-14. Pl.'s Reply Br. 3-4.

Evidence from "other sources," including "nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, therapists," and other non-medical sources, such as spouses, parents, caregivers, relatives, friends, neighbors, and clergy, may be used to show the severity of a claimant's impairments and how they affect her ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d). In order to reject evidence from "other sources," the ALJ must give germane reasons for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Here, the ALJ gave "[s]ome weight" to the September 19, 2014 medical opinion of social worker Mr. Thompson. Tr. 30. Mr. Thompson wrote that Borst's "memory and episodes of 'invasive thinking' would make holding a job extremely difficult, due to not being able to consistently focus on tasks at hand and how these tasks fit into the employer's requirements for employees." Tr. 688. First, the ALJ found that Mr. Thompson's "opinion regarding 'employer's requirements for employees' is not within his purview as a medical treatment source." Tr. 31. Although Mr. Thompson's opinion describes the likelihood of Borst's ability to work, the ALJ

was still required to consider it. *See Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) (a doctor's statement that a claimant would be "unlikely" to work full-time is "an assessment, based on objective medical evidence, of [the claimant's] likelihood of being able to sustain full-time employment" which must be considered.); *see also* 20 C.F.R. §§ 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.") This is not a germane reason to discredit Mr. Thompson.

Next, the ALJ found Mr. Thompson's opinion was "inconsistent with the completely benign mental status findings noted throughout the record," noting medical records where Borst "demonstrated normal mood and affect, normal memory, normal insight, normal judgment, made good eye contact, and had appropriate responses to questions." Tr. 31, citing Tr. 616, 635, 639, 642, 645, 648, 650, 652, 654, 658, 663, 691. As discussed above, Borst's condition was described by medical providers as idiopathic, meaning it had an unknown cause. Because Borst's medical condition had an "unknown cause," the court finds the benign test results are not a legally sufficient reason to discredit the medical opinion of Mr. Thompson. The court finds the ALJ failed to provide a germane reason for discrediting the medical opinion of Mr. Thompson.

## VI.    RFC and VE Hypothetical

Finally, Borst argues that the hypothetical posed to the vocational expert was invalid because it failed to incorporate all of his limitations and restrictions. Pl.'s Opening Br. 20, Pl.'s Reply Br. 9-10. Specifically, Borst argues that the ALJ erred by failing to incorporate the limitations described by Borst, the lay witnesses, and the treating and examining medical providers. *Id.* Essentially, Borst argues that the ALJ erred when formulating his RFC because she failed to account for all of his limitations.

The RFC is the maximum a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545, 416.945. In determining the RFC, the ALJ must consider limitations imposed by all of claimant's impairments, even those that are not severe, and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. SSR 96-8p. The ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical questions posed to the VE. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

As the ALJ erred in evaluating Borst's subjective symptom testimony and the medical opinion evidence of Dr. Wester and Mr. Thompson, the court finds the ALJ erred when formulating Borst's RFC and that the hypotheticals posed to the VE did not incorporate all of Borst's restrictions and limitations.

**VII.      Remand**

The ALJ's failure to credit Borst's subjective symptom testimony and the medical opinion of Dr. Wester and Mr. Thompson is erroneous for the reasons set out above. The VE testified that if an individual "misses one day of work per month or more at unpredictable times, they're not likely to be able to maintain employment over time." Tr. 70. The VE also testified that a person who required one to three half-hour breaks during day would not be able to maintain employment. Tr. 69. On this record, Dr. Wester wrote that he expected Borst to miss more than five days per month of work based on his evaluation of Borst. Tr. 703. If credited, that opinion establishes that Borst is disabled.

Additionally, Borst testified that he had pain flare-ups that which required him to rest and led to him being dismissed for medical absences. Tr. 93. Based on the VE testimony these unpredictable absences would prevent an individual from being gainfully employed. Tr. 69. When crediting Borst and Dr. Wester's testimony as true, this court concludes Borst is disabled based on this medical record and no useful purpose would be served through a remand of this matter for further proceedings. *See Harman v. Apfel*, 211 F.3d 1172, 1178-79 (9th Cir. 2000).

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Borst's application for disability insurance benefits and supplemental security income is reversed and remanded for the immediate payment of benefits.

IT IS SO ORDERED.

Dated this 29th day of September, 2017.

Honorable Paul Papak
United States Magistrate Judge